**PATRICIA H., individually and as Guardian Ad Litem for Jackie H., a Minor and Rebecca H., a Minor, Plaintiffs,**

v.

**BERKELEY UNIFIED SCHOOL DISTRICT, Lavoneia Steele, in her official capacity as the Superintendent of Berkeley Unified School District, Kenneth Sherer, Cliff Wong, Nancy Spaeth, Charles Hamilton, Anton Jungherr, and Does 1 through 15, inclusive, Defendants.**

No. C–92–2237 WHO.

United States District Court, N.D. California.

July 21, 1993.

ORRICK, District Judge.

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance....

Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a).

The major question raised by the cross-motions for summary judgment now before the Court[1] is whether the mandate above quoted proscribes the maintenance of a sexually hostile educational environment in any education program or activity receiving federal financial assistance. For the reasons herein stated, the Court holds that it does.

Plaintiffs also move for summary adjudication on the question of whether the administrative proceeding involving Charles Hamilton collaterally estops him from litigating in this forum his alleged molestation of Jackie H. For the reasons herein stated, the Court holds that it does.

### I.

### A.

The Supreme Court has directed federal courts to interpret Title IX to give it "a sweep as broad as its language." *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 521, 102 S.Ct. 1912, 1918, 72 L.Ed.2d 299 (1982) (quoting *United States v. Price,* 383 U.S. 787, 801, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966)). The implementing regulations of Title IX forbid any sex-based limitation "in the enjoyment of any rights, privilege, advantage or opportunity" related to federally funded education. 34 C.F.R. § 106.31(b)(7). Clearly, Title IX bans sex discrimination in educational programs and activities receiving federal funds. Thus, courts have found that Title IX bans the failure to accommodate the interests and ability of one sex in college athletic programs, *see Cohen v. Brown University,* 991 F.2d 888 (1st Cir.1993), and sex discrimination in school admissions, *see Can-*

---

1. Plaintiffs, Patricia H., Jackie H. and Rebecca H., moved for summary adjudication. Their motion was opposed separately by defendant Charles Hamilton and defendants Berkeley Unified School District ("BUSD"), Lavoneia Steele (sued in her official capacity as Superintendent of the BUSD), Kenneth Sherer, Cliff Wong, Nancy Spaeth, and Anton Jungherr (collectively "the BUSD defendants"). Plaintiffs' motion was supported by a brief of *amici curiae* NOW Legal Defense and Education Fund, Equal Rights Advocates, American Association of University Women, California Women's Law Center, National Organization for Women, National Women's Law Center, and Women's Legal Defense Fund.

The BUSD defendants filed a cross-motion for summary judgment.

*non v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). The issue of sexual harassment in an educational setting as a form of sex discrimination has been less frequently before the courts, however, and the viability of a sex discrimination claim based on hostile environment sexual harassment under Title IX is a novel question.

The Court is not without guidance in its endeavors to respond to the question. Logically, it turns to other civil rights law, Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, 2000e–2(a)(1).[2] Title IX "was patterned after Title VI of the Civil Rights Act of 1964." *Cannon,* 441 U.S. at 694, 99 S.Ct. at 1956. There is a great deal more case law involving sex discrimination claims under Title VII than under Title VI, however, and appellate courts have turned to the "substantial body of case law developed under Title VII" for assistance in interpreting Title IX. *See Lipsett v. University of Puerto Rico,* 864 F.2d 881, 896 (1st Cir.1988) (plaintiff was both employee and student); *see also Mabry v. State Bd. of Community Colleges & Occupational Educ.,* 813 F.2d 311 (10th Cir.1987) ("We find no persuasive reason not to apply Title VII's substantive standard regarding sex discrimination to Title IX suits." *Id.* at 316. "Because Title VII prohibits the identical conduct prohibited by Title IX; i.e., sex discrimination, we regard it as the most appropriate analogue when defining Title IX's substantive standards...." *Id.* at n. 6) (concerning an employment-related sex discrimination claim against a college); *Moire v. Temple Univ. Sch. of Medicine,* 613 F.Supp. 1360, 66–67 n. 2 (E.D.Pa.1985), *aff'd mem.,* 800 F.2d 1136 (3d Cir.1986). There is a sharp dispute between the parties as to just how much guidance Title VII should provide the Court.

The entire legal theory of sexual harassment has been developed in the context of Title VII. Courts first recognized *"quid pro quo"* sexual harassment, the conditioning of continuing employment or advancement on sexual favors. *See Miller v. Bank of America,* 600 F.2d 211 (9th Cir. 1979); *Williams v. Saxbe,* 413 F.Supp. 654 (D.D.C.1976) (first published opinion recognizing sexual harassment claim), *rev'd on other grounds sub nom., Williams v. Bell,* 587 F.2d 1240 (D.C.Cir.1978). A short time later, courts began to recognize that the creation of a sexually hostile work environment was also actionable sex discrimination under Title VII. *See Bundy v. Jackson,* 641 F.2d 934 (D.C.Cir.1981). The Supreme Court confirmed this view, and created the current test for a hostile environment sex harassment claim in its opinion in *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Harassing conduct must be "sufficiently severe or pervasive [as] 'to ... create an abusive working environment'" in order to violate Title VII. *Id.* at 67, 106 S.Ct. at 2405 (*quoting Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971)).

This analysis insofar as *quid pro quo* harassment is concerned had been extended to Title IX in a pre-*Meritor* decision. *See Alexander v. Yale Univ.,* 459 F.Supp. 1 (D.Conn.1977), *aff'd,* 631 F.2d 178 (2d Cir. 1980). The Court in *Alexander* looked to Title VII, reasoning:

[I]t is perfectly reasonable to maintain that academic advancement conditioned upon submission to sexual demands constitutes sex discrimination in education, just as questions of job retention or promotion tied to sexual demands from supervisors have become increasingly recognized as potential violations of Title VII's ban

---

2. Title VI provides, in relevant part:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

Title VII provides, in relevant part:

It shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex....

42 U.S.C. § 2000e–2(a)(1).

against sex discrimination in employment [citation omitted].

459 F.Supp. at 4.

Plaintiffs ask the Court to recognize that Title IX, like Title VII, bans sex discrimination, that sexual harassment is a form of sex discrimination, and that the creation of a sexually hostile educational environment is sexual harassment. Defendants argue that Title IX, as written, does not encompass hostile environment claims, and the Court should leave it to the legislature to enact such an extension of the law. Other courts have seen no distinction between recognizing *quid pro quo* sexual harassment under Title IX, which the defendants do not oppose, and hostile environment sexual harassment under Title IX. The First Circuit has explicitly applied the *Meritor* analysis of hostile environment claims to decide the liability of an educational institution under Title IX:

> We therefore hold, following *Meritor*, that in a Title IX case, an educational institution is liable upon a finding of hostile environment sexual harassment perpetrated by its supervisors upon employees *if* an official representing that institution knew, or ... should have known, of the harassment's occurrence, *unless* that official can show that he or she took appropriate steps to halt it.

*Lipsett*, 864 F.2d at 898–901, 901; *see also Moire*, 613 F.Supp. at 1366–70 (analyzing plaintiff's claim of hostile environment sexual harassment using Title VII definitions).

The exception is the United States District Court for the Western District of Pennsylvania, which, while finding that Title IX "clearly reaches ... *quid pro quo* sexual harassment," concluded flatly that "Title IX simply does not permit a 'hostile environment'

claim," based on the lack of administrative regulations in the area.[3] *Bougher v. University of Pittsburgh*, 713 F.Supp. 139, 145 (W.D.Pa.1989). The Third Circuit, however, in reviewing the district court's decision, affirmed its result based on a statute of limitations question only, stating "[a]lthough we affirm the court's ultimate judgment, we decline to adopt its reasoning *in toto* and we find it unnecessary to reach the question, important though it may be, whether evidence of a hostile environment is sufficient to sustain a claim of sexual discrimination in education in violation of Title IX." *Bougher v. University of Pittsburgh*, 882 F.2d 74, 77 (3rd Cir.1989). In light of the Third Circuit's refusal to adopt the reasoning of the district court, the reliance of the BUSD defendants on that opinion is misplaced.[4]

While the Ninth Circuit has yet to establish binding precedent in the area of sexual harassment claims under Title IX, the Supreme Court has provided some guidance in this area that this Court must follow in its decision. The Supreme Court addressed the issue indirectly in its recent ruling that Title IX will support an action for damages. *Franklin v. Gwinnett County Pub. Schs.*, —— U.S. ——, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). Christine Franklin was a student at North Gwinnett High School from September 1985 to August 1989. *Id.* —— U.S. at ——, 112 S.Ct. at 1031. In her complaint, Franklin alleged that she was harassed by Andrew Hill, a coach and a teacher at the high school, beginning in the fall of 1986, her sophomore year. *Id.* She alleged that Hill initiated conversations of a sexual nature with her, forcibly kissed her on the mouth in the school parking lot, telephoned her at home, and on three occasions in her junior

---

**3.** While this Court does not find it necessary to address the *Bougher* court's refusal to apply Title VII because of the lack of administrative regulations under Title IX, it does note that the Office of Civil Rights ("OCR") of the Department of Education, charged with enforcing compliance with Title IX, 34 C.F.R. Part 106, has repeatedly applied the definitions of sexual harassment developed in the Title VII context to analyze complaints against educational institutions. *See Letter of findings from Office of Civil Rights—Region IX, to Claremont Graduate School* (July 24, 1992) and *Letter of Findings from Office of Civil Rights—Region V to Ms. Sue Mutzinger* (Apr. 27,

1993), Pls'. Request for Judicial Notice, Exs. M & N. While the BUSD defendants have opposed judicial notice of these documents, the Court takes notice of the OCR's interpretation of the statute it is charged with enforcing while recognizing that its legal conclusions are not binding on the Court.

**4.** The Court adds that the BUSD defendants' failure to even acknowledge the nature of the Third Circuit's affirmance of *Bougher* in their moving papers was disingenuous (at best).

year, took her out of classes and subjected her to forcible intercourse in a private office. *Id.* She further alleged that her complaints to school officials brought her no assistance. Franklin filed a complaint with the OCR, which investigated her charges and found that the school district had violated Title IX by subjecting Franklin to verbal and physical sexual harassment. *Id.* —— U.S. at —— - —— n. 3, 112 S.Ct. at 1031–32 n. 3. The Court of Appeals for the Eleventh Circuit analyzed Title IX by applying Title VI precedent, declined to apply Title VII analysis, and held that damages were unavailable to Franklin. *Franklin v. Gwinnett County Pub. Schs.*, 911 F.2d 617, 622 (11th Cir.1990).

The Supreme Court reversed. It declined to reach the argument that Franklin made in the appellate court that the remedies under Title VII and Title IX should be the same. *Gwinnett*, —— U.S. at —— n. 4, 112 S.Ct. at 1032 n. 4.[5] While it characterized Franklin's complaint as alleging sexual harassment, *id.* —— U.S. at ——, 112 S.Ct. at 1031, neither the Supreme Court nor the appellate court categorized the allegations as either *quid pro quo* harassment or hostile environment harassment. Based on this footnote and the absence of any outright endorsement of a sexually hostile educational environment claim, the BUSD defendants argued at the hearing that this Court was free to, and should, reject any application of Title VII hostile environment sexual harassment case law to this Title IX claim.

While not explicitly addressing the relationship between Title VII analysis and Title IX analysis, however, the Supreme Court, like the other courts cited above, turned to Title VII law to explain its ruling on Franklin's harassment claim:

Unquestionably, Title IX placed on the Gwinnett County Schools the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). We believe the same rule should apply when a teacher sexually harasses and abuses a student.

*Id.* —— U.S. at ——, 112 S.Ct. at 1037. While, like the Supreme Court, this Court need not decide whether the analogy between relief available to Title VII plaintiffs and Title IX plaintiffs is exact in all circumstances, this Court does, like the Supreme Court, look to *Meritor* to analyze plaintiffs' claims that the continuing presence of a teacher who had sexually molested two students created such a hostile environment in the school district for those girls that the BUSD, like the Gwinnett County School District, may be liable for sex discrimination under Title IX.

As the Supreme Court acknowledged in *Gwinnett,* a student should have the same protection in school that an employee has in the workplace. *Cf. Doe v. Taylor Indep. Sch. Dist.*, 975 F.2d 137, 149 (5th Cir.1992) ("there is no meaningful distinction between the work environment and school environment which would forbid such discrimination in the former context and tolerate it in the latter. Women need not endure sexual harassment by state actors under any circumstances, the school setting included.") (decided under equal protection laws). The distinctions between the school environment and the workplace serve only to emphasize the need for

---

**5.** Footnote 4 reads in full:

The [appellate] court also rejected an argument by Franklin that the terms of outright prohibition of Title VII . . ., apply by analogy to Title IX's antidiscrimination provision, and that the remedies available under the two statutes should also be the same. Because Franklin does not pursue this contention here, we need not address whether it has merit. (Citation omitted.)

The appellate court had addressed Franklin's argument in the following way:

Finally, we note that Franklin has invited this court to apply a Title VII analysis to this case.

Titles VI and IX, as well as Title VII, all have an antidiscrimination purpose. But while Titles VI and IX speak in terms of conditional grants which may be terminated if discrimination occurs under any federally funded program, Title VII . . . speaks in terms of outright prohibitions, making discrimination in an employment setting an unlawful employment practice. We do not believe applying Title VII to Title IX would result in the kind of orderly analysis so necessary in this confusing area of the law. For this reason, we decline to do so. 911 F.2d at 622 (footnote omitted) (citation omitted).

zealous protection against sex discrimination in the schools:

> [T]he importance and function of environment is different in academia than in the workplace.... A nondiscriminatory environment is essential to maximum intellectual growth and is therefore an integral part of the educational benefits that a student receives. A sexually abusive environment inhibits, if not prevents, the harassed student from developing her full intellectual potential and receiving the most from the academic program.

> . . . . .

> [A] higher standard should be imposed upon a faculty member's behavior toward his student than that which is imposed upon an employer with regard to his employee.... The student-faculty relationship encompasses a trust and dependency that does not inherently exist between parties involved in a sexual harassment claim under Title VII.

Ronna Greff Schneider, *Sexual Harassment and Higher Education*, 65 Tex.L.Rev. 525, 551 (1987).[6]

This Court, therefore, holds that the law permits plaintiffs to state a claim for hostile environment sexual harassment under Title IX.[7]

### B.

### 1.

The Court now turns to the facts to determine whether either of the cross-motions for summary judgment may be granted. Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the burden of showing that no genuine issues of material fact remain for trial, and presenting evidence of the existence of all the elements essential to that party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has made this showing, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

The Court asked the parties, after the hearing on plaintiffs' motion for preliminary injunction,[8] to submit a joint statement of undisputed facts to facilitate the decision of these motions. The parties were only able to agree on four facts: (1) the BUSD operates Berkeley High School ("BHS"), Willard Junior High School, Martin Luther King, Jr. Junior High School and various other elementary schools, and receives federal funds; (2) Patricia H. is the mother of minors Jackie H. and Rebecca H.; (3) Charles Hamilton is, and from 1972 through the present has been, employed by the BUSD, teaching band at various schools, including Willard Junior High, BHS, Columbus Elementary and John Muir Elementary Schools;[9] and (4) Patricia H. and Hamilton were involved in a romantic relationship during 1987 and parts of 1988, during which time Hamilton spent some nights in Patricia H.'s home.

---

**6.** *See also Doe,* 975 F.2d at 147:

> Parents, guardians, and the children themselves have little choice but to rely on the school officials for some measure of protection and security while in school and can reasonably expect that the state will provide a safe school environment. To hold otherwise would call into question the constitutionality of compulsory attendance statutes, for we would be permitting a state to compel parents to surrender their offspring to the tender mercies of school officials without exacting some assurance from the state that school officials will undertake the role of guardian that parents might not otherwise relinquish, even temporarily.

**7.** The Court notes that the State of California has recognized sexual harassment as a form of sexual discrimination in § 212.6 of the California Education Code, which is actionable when "[t]he conduct has the purpose or effect of having a negative impact upon the individual's work or academic performance, or of creating an intimidating, hostile, or offensive work or educational environment." Cal.Educ.Code § 212.5(c).

**8.** A preliminary injunction was denied by the Court's Order of February 25, 1993.

**9.** Aside from his period of suspension, see discussion *infra* section I.B.1.

After reviewing the record, the Court has determined that the following facts also exist without substantial controversy, and they shall be deemed established at trial, pursuant to Rule 56(d) of the Federal Rules of Civil Procedure.[10]

Patricia H. has three daughters, Tanya H., Jackie H. and Rebecca H. Tanya now attends college, after graduating from BHS. Jackie H. was entering her senior year at BHS when this lawsuit was filed, and has since been graduated. Rebecca H., the youngest daughter, is of high school age. Most recently, she has attended East Campus Continuation School in the BUSD.

Patricia H. and her daughters reside in Berkeley, a five minute walk from BHS. BHS is the only regular high school with college preparatory classes in the BUSD.

As the parties have stipulated, Patricia H. and Hamilton were involved in a romantic relationship during 1987 and parts of 1988. On or about December 26, 1987, they took a trip to Lake Tahoe, Nevada, accompanied by Jackie H., then age twelve, and Rebecca H., then age ten. On or about January 15, 1988, Jackie H. told her mother that while at Lake Tahoe, Hamilton forced her to handle his genitals and made lewd and lascivious remarks to her, and that in the second week of January 1988, when the family was back in Berkeley, Hamilton climbed into bed with her while naked and rubbed against her.

On or about November 21, 1988, Patricia H. made a formal complaint against Hamilton to the Berkeley Police Department. Officer Cynthia Harris investigated the complaint. Jackie H. repeated her allegations to Officer Harris. Rebecca H., when interviewed on November 21, 1988, told Officer Harris on November 21, 1988, that she had not been molested by Hamilton. On November 28, 1988, the Berkeley Police Department reported the allegations against Hamilton to Andrew Viscovich, then Superintendent of the BUSD, and defendant Kenneth Sherer,[11] then principal of BHS. On November 29, 1988, Hamilton told Officer Harris that in November 1987, he was a regular user of cocaine, was drinking heavily, and using marijuana. He told Officer Harris that in January 1988, he went into Jackie H.'s room fully clothed and started "playing around" with her, "stroking" and "tickling." He denied anything happened during the trip to Lake Tahoe.

On or about January 9, 1989, charges were filed against Hamilton in the Berkeley–Albany Municipal Court, alleging a misdemeanor violation of § 647.6 of the California Penal Code. On or about February 6, 1989, the BUSD put Hamilton on compulsory leave of absence without pay. Before that date, Viscovich informed Wong, then Associate Superintendent of Instruction, that Hamilton had been accused of molestation. On or about March 22, 1989, the California Commission on Teacher Credentialing ("Commission") notified Hamilton that his Standard Secondary Teaching Credential was suspended effective January 9, 1989, pursuant to § 44940 of the California Education Code.

On or about April 7, 1989, the charges against Hamilton were dismissed, on the condition that he (1) participate in a program of substance abuse counseling and one-on-one psychotherapy, and (2) submit written progress reports prepared by his therapists at ninety days and six months to Dorothy S. Landsberg, counsel for the BUSD. On April 13, 1989, the Commission notified Hamilton that his credential was reinstated effective April 7, 1989, and the matter had been referred to the Committee of Credentials ("Committee") for its determination of whether there was cause for disciplinary action.[12]

10. Despite the inability of counsel to file a joint statement of undisputed facts, the BUSD defendants dispute only eight of plaintiffs' sixty-eight facts, and Hamilton, another sixteen. Thus, much of the statement below consists of facts that the parties have already agreed are undisputed. Other facts the Court finds exist without substantial controversy because the disputing party has failed to submit sufficient evidence in contradiction to create an actual factual controversy.

11. Defendants Steele, Sherer, Wong, Spaeth, and Jungherr are administrators in the BUSD.

12. The Committee is composed of seven individuals and investigates allegations for probable cause, conducts hearings on the allegations, and

On or about July 20, 1989, Rebecca H. apprised Patricia H. for the first time that Hamilton had molested her around December 15, 1987, when she was ten years old. Rebecca H. gave her a note which read: "Mom, Charles did sexualy [*sic*] abuse me can we talk about it thourgh [*sic*] letters."

On or about July 21, 1989, Patricia H. supplemented her complaint to the Commission with Rebecca H.'s allegations. On July 24, 1989, Patricia H. called Officer Harris and reported Rebecca H.'s statements to her. Officer Harris conducted an investigation, and Rebecca H. repeated the allegations to her. No charges were filed.

### 2.

Rebecca H. attended LeConte School in Berkeley from kindergarten through the third grade. She was described on report cards as an "excellent student" with "leadership potential," was recommended for gifted and talented evaluation in the second grade, and received "excellent" ratings in all areas of personal development and study habits. Rebecca H. attended fourth grade at the Malcolm X School. Her report cards from that year show that she was performing at grade level in all academic areas, and that she received "excellent" ratings in all areas of personal development and study habits.

During the 1987–88 school year, the time of the alleged molestation, Rebecca H. attended fifth grade at Malcolm X. Her teacher noted that Rebecca H. was "not working up to her potential in Reading and Language Arts—too easily distracted by her peers—socializing a real problem—she needs a lot of help at home in basic organization—gets behind in homework and needs math tutor." In 1988–89, Rebecca H. attended sixth grade at Malcolm X. Her report card shows attendance for two out of three grading periods. Rebecca H. received an "unsatisfactory" rating in all academic subjects.

In 1989–90, Rebecca H. began seventh grade at Willard Junior High. She had serious problems with attendance and tardiness. Her teachers described her as defiant and inattentive. While in her first semester she received two B's, two C's, one D, and two P's, in her second semester she received four D's and three F's.

After Rebecca H. began eighth grade at Willard in October 1990, Patricia H. requested that Rebecca H. be transferred to Martin Luther King, Jr. Junior High ("King") to give her a "fresh start." Rebecca H. began attending King in November 1990. Rebecca H.'s attendance at King was very poor.

From November to December 1990, Rebecca H. was enrolled in Contra Costa Alternative School, a private school in Orinda. In December 1990, Rebecca H. began counseling at Berkeley Mental Health's FYC Services. The therapist described Rebecca H.'s behavior as symptomatic of post-traumatic stress caused by sexual molestation. On January 10, 1991, Rebecca H. enrolled in the Crossroads program in Berkeley. During a thirty-six-day period, she attended school sixteen days, and was tardy thirteen of those days. Rebecca H. left the Crossroads program and did not complete the 1990–91 school year.

In the fall of 1991, Rebecca H. began school at Albany High School, which is located in the neighboring community of Albany, a one-hour commute from Rebecca H.'s residence in Berkeley. In the first three weeks of the semester, Rebecca H. accumulated sixteen unexcused absences. She received nearly all F grades. In November 1992, Rebecca H. enrolled in the East Campus Continuation School. Her attendance rate has been very poor.

### 3.

Jackie H. was in seventh grade at the time of the alleged molestation. In August 1988, Jackie H. moved to Minnesota and stayed with relatives there for a year while attending eighth grade. Upon her return from Minnesota, Jackie H. commuted to the neighboring community of El Cerrito and attended her freshman year at El Cerrito High School in the 1989–90 school year. In the 1990–91

reports to the Commission on its finding of probable cause and its recommendation for action, if any. Cal.Educ.Code § 44242.5.

school year, Jackie H. attended BHS as a sophomore. She remained in attendance at BHS, and was graduated on June 18, 1993. At the mid-point of her senior year, her grade point average was 2.86 (3.00 for grades 10–12) and she was ranked 251st out of 571 students in her class. While at BHS, Jackie H. played on the girls' basketball team and participated in student government. She did not take any music or drama classes, although she had previously studied the piano.

### 4.

Hamilton teaches band and jazz throughout the BUSD. Besides leading the band at BHS, he teaches music classes at other schools. At BHS, as part of his duties, he leads the band in performances at school assemblies and at sporting events. During the 1992–93 school year, in the fall semester, Hamilton taught at BHS during the seventh and eighth period. Band is taught in Building A where other music and dramatic arts are taught. In that semester, Jackie H.'s school day ended after the seventh period, and her seventh period class was in the campus building furthest from Building A.

### C.

### 1.

The facts thus found in this case differ in important ways from those in *Franklin,* but, in combination with alleged but as yet unproven facts, still may support a finding of hostile environment sexual harassment as such a finding has been defined by the Ninth Circuit after *Meritor.* Plaintiffs allege that off school grounds, Hamilton sexually molested Jackie H. and Rebecca H. by unwanted and improper touching. They allege that the mere presence of Hamilton as a teacher, a figure of authority and respect, in the schools Jackie H. and Rebecca H. were attending, or would have attended but for his presence, created a hostile environment that deprived them of full enjoyment, and during the semesters of their absence, any enjoyment, of their education within the BUSD. Jackie H. attended school in Minnesota for a year, and then in El Cerrito for a year, and Patricia H.

has declared that she enrolled Jackie H. in these out-of-district schools to keep Jackie H. away from Hamilton. Jackie H. has declared that once she attended BHS, she feared encountering Hamilton, occasionally fled after such encounters, and chose not to take any courses in music or the dramatic arts to avoid the building where he taught. She alleges that her daily experiences were tainted by fear of Hamilton. While she could avoid the building where he taught, Jackie H. was forced to encounter Hamilton when in her roles as student government member and basketball team member she attended school assemblies and sporting events. Rebecca H. similarly has declared that she fled school grounds after encountering Hamilton at King, and has been unable to attend BHS due to her fear of Hamilton's presence.

The most recent discussion of the test for hostile environment sexual harassment in this circuit is in *Ellison v. Brady,* 924 F.2d 872 (9th Cir.1991). In that opinion, the Ninth Circuit recognized that "in some cases *the mere presence* of an employee who has engaged in particularly severe or pervasive harassment can create a hostile ... environment." *Id.* at 883 (emphasis added). The hostile environment is assessed from the perspective of a reasonable victim. *Id.* at 878. In the employment context of *Ellison,* the standard used was one of a "reasonable woman." *Id.* at 879. Similarly, the OCR has recommended that when considering whether an actionable hostile environment has been created in an educational setting, the determining body should consider "the age of the victim(s); the frequency, duration, repetition, location, severity, and scope of the acts of harassment; [and] the nature of context of the incidents," in essence using a "reasonable student" standard. Request for Judicial Notice, Ex. N at 2. Like the Ninth Circuit and the OCR, this Court adopts the perspective of a "reasonable victim" to determine whether as a matter of law, plaintiffs have stated a claim under Title IX. They have alleged that at a young age, ten and twelve years, they were subjected to sexual molestation of a severe nature.[13] The very severity of the

---

13. As discussed above, Jackie told her mother and the police that Hamilton forced her to touch

molestation, and the grave disparity in age and power between the girls and Hamilton, suggests that a reasonable student, having experienced such an assault, would be intimidated and fearful of Hamilton's presence at her school, so much so that her fear would interfere with her ability to learn,[14] and to enjoy all aspects of her education fully, even though the alleged molestations were isolated in time and occurred outside of the school setting. The Court is unable to declare, as matter of law, that Jackie H. and Rebecca H. did not experience a hostile environment in the BUSD. The Court, however, also cannot declare that, as a matter of law, a hostile environment did exist. The question, whether a reasonable female student of Jackie H.'s age,[15] having experienced the harassment she alleges, would find Hamilton's mere presence at BHS created a hostile environment, is one for the jury.

### 2.

Plaintiffs further allege that Patricia H.'s complaints and requests for assistance from the BUSD went unheeded. Patricia H. alleges that the only response she got from her requests to discuss the effect of Hamilton's presence on her daughters' education was a suggestion that she move her daughters out of the district. Plaintiffs, therefore, argue that the girls were subjected to a hostile educational environment in the BUSD, and that the BUSD failed to take steps reasonably and legally necessary under Title IX to remedy the situation.

Liability of the BUSD defendants is conditioned on both a finding of hostile environment and their knowing failure to act. An employer is liable if it fails to take "immediate and appropriate" action "reasonably calculated" to remedy the harm complained of. *Ellison*, 924 F.2d at 881. Just as the Gwin-

nett school district could be liable after Franklin complained and received no help, and Ellison's employer could be liable for its subpar efforts on her behalf, the BUSD may be liable if it failed to take reasonable steps to aid Jackie H. and Rebecca H.

While it is undisputed that the BUSD knew of the criminal charges against Hamilton, and suspended him while the charges were pending, and again upon the decision of the Commission, the communications between Patricia H. and various BUSD defendants regarding her daughters are in dispute, as well as the efforts taken by the BUSD defendants to ameliorate the problem. For example, plaintiffs claim that Wong, Spaeth, Steele and Jungherr failed to respond in writing to Patricia H.'s concerns or to talk to Hamilton. The BUSD defendants claim that far from ignoring Patricia H., they were always ready, willing, and able to help plaintiffs in any way. Wong has declared that prior to Hamilton's suspension, he did speak with Hamilton about the matter, and, further, that he never had any correspondence or discussions with Patricia H. regarding her daughters. Patricia H. has declared that she wrote to Wong and spoke to him on or about April 20, 1989. Spaeth declares that her offer to help Patricia H. transfer her daughters was appropriate action given her understanding that Hamilton could not be fired. Obviously, the liability of the BUSD defendants, which hinges on the resolution of these factual disputes and a determination of whether the responses were reasonable, must be left to the jury. Plaintiffs have not met their burden of showing that as a matter of law, the BUSD defendants are liable.[16]

### D.

■ In addition to the Title IX issue, the BUSD defendants also moved for summary

---

his genitals through his clothing and climbed into bed with her while naked and touched her genitals. Rebecca alleged that Hamilton forcibly raped her.

14. *Cf.* "[S]exual harassment violates Title VII where conduct creates an intimidating, hostile, or offensive environment *or* where it unreasonably interferes with work performance." *Ellison*, 924 F.2d at 877 (citing 29 C.F.R. § 1604.-11(a)(3)).

15. Plaintiffs sought summary judgment on Jackie H.'s Title IX claim only. Because it has not been proven that Hamilton molested Rebecca, her Title IX claim is doubly unsuited for summary judgment.

16. These factual disputes also preclude summary judgment under the second and fourth causes of action based on § 1983 and state law.

judgment against Jackie H. on the basis of mootness and against Rebecca H. on the basis of ripeness. As the BUSD defendants acknowledge in their reply brief, former students have a claim for damages under Title IX under *Franklin* and, therefore, Jackie H.'s graduation does not render her claims for damages moot, only her claim for prospective relief.

▮ The BUSD defendants also argue that Rebecca H.'s claim is unripe.

The ripeness doctrine prevents courts from deciding theoretical or abstract questions that do not yet have a concrete impact on the parties.

. . . .

The ripeness inquiry has two prongs: fitness of the issue for judicial decision and hardship to the parties if court review is withheld.

*Assiniboine & Sioux Tribes v. Board of Oil & Gas Conservation*, 792 F.2d 782, 787–88 (9th Cir.1986) (citations omitted). They argue that Rebecca H.'s claim under Title IX is not fit for judicial decision because she is not currently, nor will she be in the fall, attending a school where Hamilton is present, and further, even if Hamilton were to be banished from BHS, Rebecca H. could not attend BHS.

Rebecca H. is of high school age. BHS is the only regular high school in the BUSD. Both she and her mother have declared her desire to attend BHS, but for Hamilton's presence on the campus. Patricia H. has declared her understanding, based on a reported conversation with Wong, that she can enroll Rebecca H. in BHS when she chooses. The BUSD defendants, however, have submitted declarations from the principals of Rebecca H.'s current school, East Campus, and of BHS, explaining that under the BUSD regulations, Rebecca H. is currently ineligible for transfer to BHS due to her failure to achieve a minimum grade point average and attendance record. Plaintiffs attempt to create a factual dispute about Rebecca H.'s eligibility by Patricia H.'s declaration, but do not refute the existence of a school district policy governing transfers. To defeat summary judgment, a party needs to raise a "genuine" issue of material fact, and Patricia H.'s declaration as a parent does not create a material dispute about confirmed BUSD policy. Because Rebecca H. lacks the credits, grades, and attendance records to attend BHS next year, while the removal of Hamilton might provide psychic satisfaction and some incentive to earn the right to attend BHS, it will not guarantee that Rebecca H. will be able to attend BHS. Therefore, it will be no hardship to Rebecca H. if her claim for prospective relief is barred until she is able to attend BHS, and is prevented from doing so only by Hamilton's presence. Therefore, the Court will not reach out to decide her unripe claim.

Rebecca H.'s complaint, like Jackie H.'s, however, is not limited to prospective relief. Plaintiffs have alleged considerable concrete impact on Rebecca H.'s life to date because of Hamilton's presence in the schools. As her school reports from her early years illustrate, at one point Rebecca H. was a student who gave every indication that someday she would be eligible to enroll in BHS, her neighborhood high school. Her school reports since the alleged molestation show a steady slide into scholastic failure. She has alleged that because she encountered Hamilton on school grounds, while attending junior high at King, and fled both the campus and her home, she has been unable to attend her regular school within the BUSD. Her schooling has been disrupted for years as she has transferred out of district, in and out of private school, and finally in and out of special education programs. She, thus, claims that her academic difficulties, which now prevent her from enrolling in BHS regardless of Hamilton, stem from the molestation and Hamilton's presence in the BUSD schools. Like her sister Jackie H. and like Christine Franklin, Rebecca H. has left the allegedly hostile environment, but her past harm has had a "concrete impact," and is fit for judicial decision. She should not be punished for a hostile environment so severe that she was forced out entirely by loss of her legal claim against those responsible for the situation.[17]

**17.** Similarly, the Ninth Circuit found that the

decision of Ellison's employer to grant her re-

Therefore, the Court finds that Rebecca H.'s claim, insofar as she seeks damages for past harm, is ripe. As discussed in subsection C, that portion of her claim will be left to the jury for adjudication.

## II.

### A.

■ In the other half of their motion for summary adjudication, plaintiffs argue, based on the proceedings before the Commission, that Hamilton is estopped from denying that he molested Jackie H. The Court finds that there is no material dispute as to the following facts that pertain to this part of the motion.

On or about March 22, 1989, the Commission notified Hamilton that his Standard Secondary Teaching Credential was suspended effective January 9, 1989, pursuant to § 44940 of the California Education Code, because he had been charged with a sex crime involving a minor. On April 13, 1989, after the criminal charges against Hamilton were dropped, as described above, the Commission notified Hamilton that his credential was reinstated and the matter had been referred to the Committee for its determination of whether there was cause for disciplinary action.

On May 16, 1989, the Committee sent Hamilton a notice of allegations of misconduct, to wit:

It is alleged that on December 27, 1987 you took the hand of a 12–year old female [redacted] and placed it on your penis through your clothing. In the second week of January 1988 you entered a room with no clothes on and got into bed with [redacted]. You started feeling her vaginal area. Subsequently the mother confronted you with the accusation that you had molested her child and you told her it was true. You told her you were a cocaine addict.

Request for Judicial Notice, Ex. E at 97. Paul Longo, Administrator of Professional Standards, invited Hamilton to provide any explanation, clarification, or statement to assist the Committee to evaluate his fitness for teaching. On July 3, 1993, Hamilton submitted a letter to the Commission,[18] accompanied by a copy of the police report prepared by Officer Harris from her investigation of the criminal charges. He stated that "the allegations were an isolated incident of extremely poor judgment and misconduct on my part" and that the District Attorney shared his perception that "this entire event was the product of my unfortunate abuse of alcohol and cocaine." *Id.*, Ex. E at 248.

At no time since the inception of these events have I ever attempted to minimize the seriousness of the charges nor my responsibility for any harm I may have caused due to my conduct. I am attaching a copy of the police report ... [which] contains my statement.... I believe that my statement contained in the report is accurate and reflects to the best of my ability my recollection of the events in question. Due to the length of time that has elapsed since the event, as well as, my admitted intoxication at the time of the event, I am afraid that I am unable to further elaborate on what occurred.

*Id.* at 248–249.[19] On or about July 10, 1989, Patricia H. filed an affidavit under penalty of

---

quest for a transfer when her harasser was returning to her workplace did not cure the hostile environment. "We strongly believe that the victim of sexual harassment should not be punished for the conduct of the harasser." 924 F.2d at 882.

**18.** The letter, while addressed to the Commission, was considered by the Committee.

**19.** As recorded in the police report, Hamilton's statement is as follows:

Mr. Hamilton told me that around November, 1987, he was a "regular" user of cocaine and started drinking more heavily. He told me that the holiday season is a difficult time of year for him. Also during that time he started smoking marijuana. He told me one night in January of 1988, he had come home to the house before midnight. He had been drinking heavily. He came into the house and everyone was asleep but he heard the television in [redacted] room. He went into [redacted] room fully clothed and started "playing around" with her. I asked Hamilton what playing around meant. He described it as stroking and tickling. I asked him while during this "playing around" did he tickle [redacted] breasts. He told me he didn't want to answer that question without counsel. I asked him if

perjury with the Commission, charging Hamilton with molesting Jackie H., which was considered by the Committee.

On July 26, 1989, Longo notified Hamilton that the Committee had considered his letter and had determined it would hold a meeting to consider the allegations against him. He was informed:

> You and/or your attorney have the right to inspect and copy the evidence which constitutes the basis for the said allegations, and to be present and represented at the Committee proceedings.... Whether you elect to appear or not to appear, the Committee will at that time determine whether the allegations are true and constitute probable cause for adverse direction against you.

*Id.,* Ex. F at 96.

On September 20, 1989, Hamilton appeared before the Committee, accompanied by an attorney, and testified under oath. The meeting was recorded on audiotape. On September 25, 1989, Longo sent Hamilton a notice that the Committee had made a finding of probable cause that the allegations were true, and recommended to the Commission the suspension of his teaching credential for three months. Hamilton had thirty days to demand an administrative hearing on the allegations against him, or request a reconsideration, but did not do so. On December 19, 1989, the Commission adopted the Committee's finding and served Hamilton with notice of its decision to suspend his credentials for three months, effective January 18, 1990.

### B.

The collateral effect of a state agency action is determined by application of the analysis first outlined by the United States Supreme Court in *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). "When an administrative agency is [1] acting in a judicial capacity and [2] resolves disputed issues of fact properly before it [3] which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose." *Id.* at 422, 86 S.Ct. at 1560. The Ninth Circuit has not hesitated to give preclusive effect to the decision of a state administrative agency, regarding both fact and law, provided that the decision meets the *Utah Construction* requirements. *Guild Wineries & Distilleries v. Whitehall Co.,* 853 F.2d 755, 758 (9th Cir. 1988). The California Supreme Court addressed the preclusive effect of agency decisions in great depth in *People v. Sims,* 32 Cal.3d 468, 186 Cal.Rptr. 77, 651 P.2d 321 (1982), and the Ninth Circuit has looked to *Sims* when settling such issues. *See, e.g., Eilrich v. Remas,* 839 F.2d 630, 633 (9th Cir.1988). In addition to the requirements of *Utah Construction, Sims* contains three more criteria: "(1) the issue necessarily decided at the previous [proceeding] is identical to the one which is sought to be relitigated; (2) the previous [proceeding] resulted in a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party, or, in privity with a party, at the prior [proceeding]." *Id.*

The *Sims* criteria are not seriously in dispute here. The Committee found that there was probable cause supporting suspension of Hamilton's credentials, and under § 80310 of 5 California Code of Regulations, probable cause is found when "the weight of the evidence ... is sufficient to cause a majority of the Committee to believe that the allegations of misconduct or unfitness are true and that an administrative hearing thereon would result in denial, suspension, or revocation of the credential in issue." The allegations of misconduct, as quoted above, were that Hamilton had sexually molested Jackie H. in December 1987 and January 1988. Plaintiffs ask that Hamilton be precluded from litigating the identical issue in this proceeding, *i.e.,*

---

he had his clothes on during the entire time that he was "playing around." He told me that he didn't want to answer that question. He said that [redacted] got very agitated with him and asked him to leave her alone. He said before he left he asked [redacted] for a kiss. She kissed him on the cheek. He described [redacted] as his favorite of the [redacted] children and he felt that they had a special rapport and he felt it was "okay for him to mess around with her". I asked had anything happened during the Tahoe trip of Christmas of 1987, and he said no.

*Id.,* Ex. E at 261.

whether he molested Jackie H. in December 1987 and January 1988. The previous proceeding reached a decision on the merits, a finding of probable cause leading to suspension, which became final after Hamilton declined to exercise his right to an administrative hearing or to seek review in the California courts. Hamilton is, of course, the same party as in the prior proceeding.

Hamilton, however, argues that the *Utah Construction* criteria are not met. He points out, correctly, that the statutory scheme provides for two layers of administrative hearings. Cal.Educ.Code § 44242.5. As occurred in Hamilton's case, the Committee may choose to have a "meeting or hearing ... to consider allegations" as part of its investigation. § 44242.5(b)(3). At such a hearing, as Hamilton was notified, the credential holder has the right to an attorney, to obtain all the evidence against him, to testify on his own behalf, and to present witnesses on his behalf. All testimony, as at the hearing on Hamilton, is taken under penalty of perjury, and a tape recording of the hearing is kept. The credential holder, like Hamilton, does not have the right to have his attorney question witnesses, or to cross-examine witnesses, although rebuttal evidence is permitted. 5 Cal.Code of Regs. § 80317.2. After the hearing, the Committee issues a written decision, such as it sent to Hamilton, notifying him of its finding of probable cause. Then the credential holder has the option of initiating what the statute terms an "adjudicatory hearing." Cal.Educ.Code § 44242.-5(b)(2)(B).

Hamilton argues that because he only had an "investigative hearing," not an "adjudicatory hearing," he has not had an opportunity to litigate before an agency acting in a "judicial capacity" as required under *Utah Construction.* The statutory terms for the two hearings, however, are not determinative. Although Hamilton, by his own choice, did not have the full trial before an administrative law judge with the right to examine and cross-examine, and perhaps a more rigorous application of the rules of evidence, an agen-

cy proceeding need not have all the indicia of a trial to have a preclusive effect.[20] For example, a plaintiff who was "permitted to present oral and documentary evidence, and ... to call witnesses," and received a written decision, had adequate opportunity to litigate his claim to entitle the written agency decision to preclusive effect. *Miller v. County of Santa Cruz,* 796 F.Supp. 1316, 1319 (N.D.Cal.1992). The Ninth Circuit found that a hearing officer who "applied an established rule to specific existing facts rather than establishing a rule of law applicable to future cases," acted in a "judicial capacity." *Eilrich v. Remas,* 839 F.2d 630, 634 (9th Cir.1988). Similarly, the Committee applied its statutory rule of probable cause to the facts it uncovered through investigation and issued a decision. In *Utah Construction,* the Supreme Court stated that when "both parties had a full and fair opportunity to argue their version of the facts and an opportunity to seek court review of any adverse findings," an agency which heard their dispute was acting in a judicial capacity. 384 U.S. at 422, 86 S.Ct. at 1560. Thus, the Ninth Circuit has found that a Board of Supervisors, which held informal proceedings during which, although the party was represented by counsel, the witnesses were never sworn, the party did not examine or cross-examine the witnesses, and the rules of evidence were not followed, was acting in a judicial capacity. *Valley Wood Preserving, Inc. v. Paul,* 785 F.2d 751, 753 (9th Cir.1986). The crucial factors were that the board acted according to an ordinance that provided for an investigation, with notice to the permit holder and an opportunity to be heard. *Id.* Hamilton, as a credential holder, had both notice and an opportunity to be heard, as well as an opportunity to present evidence under oath, both at the hearing, and prior and subsequent to the hearing. He had every incentive to litigate fully because he was facing permanent revocation of his credential and his means of livelihood. Because the Committee was acting in a judicial capacity when it resolved the

---

**20.** The California Supreme Court, in *Sims,* found that a decision of a state agency could be given preclusive effect against a party which *chose* not to present evidence at the prior proceeding, since

it still had the opportunity to litigate. 32 Cal.3d at 481–82, 186 Cal.Rptr. at 85, 651 P.2d at 329–30.

issue of fact that Hamilton seeks to litigate again in this Court after having an opportunity to litigate it in another forum, the Court applies *res judicata* to enforce repose, and holds under Rule 56(d) of the Federal Rules of Civil Procedure, that as a matter of law, Hamilton molested Jackie H. in December 1987 and January 1988, as described in the May 16, 1989, Notice of Allegations.[21]

### III.

Accordingly,

IT IS HEREBY ORDERED that:

1. Plaintiffs' motion for summary adjudication is GRANTED in part and DENIED in part, as described above.

2. The BUSD defendants' cross-motion for summary judgment is DENIED, except that Rebecca H.'s Title IX claim, insofar as she seeks prospective relief, is dismissed as unripe.

---

**21.** Hamilton seeks sanctions against plaintiffs for making the collateral estoppel argument based on the misguided view that the argument, which the Court had specifically requested plaintiffs to bring before the Court on an early motion, was not well-grounded in law or fact. The Court declines to impose sanctions, finding that plaintiffs acted in good faith in complying with the Court's request, and that their argument is meritorious.