United States Court of Appeals
For the First Circuit

No. 98-1701

MARKETA WILLS,

Plaintiff, Appellant,

v.

BROWN UNIVERSITY, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Boudin, Lynch, and Lipez, Circuit Judges. 

Sheila A. Engelmeier with whom Shane H. Anderson and Mackall,
Crounse & Moore, PLC were on brief for appellant.
Steven M. Richard with whom Peter J. McGinn, Tillinghast Licht
& Semonoff Ltd., Beverly E. Ledbetter, and Janice E. Wright were on
brief for appellees.

July 15, 1999

BOUDIN, Circuit Judge. This appeal involves a lawsuit
seeking damages for sexual harassment brought in the district court
by the plaintiff, Marketa Wills, against Brown University and one
of its former teachers, Professor Kayode Adesogan. The principal
issues on appeal, but not the only ones, involve Title IX of the
Education Amendments of 1972, 20 U.S.C. 1681 et seq. The
background events and the proceedings in the district court are as
follows.
Adesogan, a chemistry professor at a Nigerian university,
taught as a visiting professor at Brown between 1991 and 1994. In
the fall semester of 1992, Wills--then a sophomore at Brown--took
a course in organic chemistry. Although assigned to a section
taught by Professor Ronald Lawler, Wills began to attend lectures
in the other organic chemistry section, this one taught by
Adesogan. Wills had earlier introduced herself to Adesogan at a
social event and attended a small study group held by Adesogan in
addition to his formal lectures.
On December 9, 1992, Wills sought out Adesogan in his
office because she was having difficulty in the course. During
this encounter, while purporting to pray with Wills, Adesogan twice
pulled Wills into his lap, allegedly put his hand under her shirt,
rubbed her stomach and twice touched or rubbed her breasts. The
next day Wills met with Dean Karen Romer, who was then associate
dean of academic affairs and had special responsibility for sexual
assault or harassment claims; on December 14, 1992, Wills filed a
written complaint. This incident lies at the core of Wills's
subsequent suit against Brown and Adesogan.
In response to Wills's written complaint, Provost Frank
Rothman and Dean of Faculty Bryan Shepp met with Wills on December
14, 1992, and then separately with Adesogan on December 15, 1992. 
Adesogan admitted hugging Wills, drawing her onto his lap and
touching her breast, although he denied placing his hand under
Wills's shirt. By letter dated December 23, 1992, Rothman placed
Adesogan on probation, stating in a written reprimand that a
further incident would be grounds for immediate dismissal but that
this appeared to be Adesogan's first instance of improper behavior
during his stay at Brown.
Rothman was mistaken. In October 1992, Adesogan had
inappropriately hugged and touched another student, Laura
Schleussner, who was enrolled in his section and had come to meet
with him for help. Schleussner had then met with Dr. Barbara
Tannenbaum, a lecturer at Brown, who was acting as an ombudswoman
for Brown to oversee sexual harassment services. At trial,
Schleussner and Tannenbaum gave somewhat different versions of the
meeting, especially as to how much detail Schleussner provided. It
appears that Schleussner wanted to remain anonymous but did want
something done to prevent repetitions.
Schleussner had also complained to a chemistry department
lecturer whom she knew and trusted, and that lecturer spoke in due
course with Lawler, who taught the other section of organic
chemistry. Lawler in turn told Adesogan that students would feel
more comfortable if Adesogan kept his door open when conferring
with students, but Lawler--who may have known few details--did not
further advise the provost or anyone else in Brown's
administration.
In February 1993, Rothman accepted the recommendation of
the chemistry department that Adesogan be retained for another year
and given a raise. In September 1993, another student, Tilly
Gurman, filed a complaint that Adesogan had sexually harassed her
in the fall of 1992. Romer informed Rothman, and Romer suggested
no action because the Gurman incident had occurred before Adesogan
had been reprimanded, and both Romer and Rothman believed that the
warning to Adesogan in December 1993 had been sufficient.
In January 1994, another student, Amy Sanford, reported
to Romer that between the fall of 1993 and January 1994, Adesogan
had engaged in inappropriate conduct with Sanford (e.g., by
repeated hugs and kisses), and Sanford told Romer that Adesogan had
previously harassed another friend. Romer reported the matter to
her immediate superior but it was not carried further, apparently
because Sanford had not wanted it officially pursued.
Wills, after her own experience with Adesogan in December
1992, had not sought any further contact with him. She saw him
thereafter on two different occasions: first, on an unspecified
date, Adesogan entered a drugstore where Wills was working, and
Wills immediately retreated to a back room; second, in January
1994, Wills enrolled in another chemistry course and discovered
that Adesogan was the teacher. Wills testified that she rarely
attended the lectures after the first session, but Adesogan did not
long remain at Brown. During March 1994, Brown received further
complaints of harassment by Adesogan from six or more other female
students. That same month Brown dismissed Adesogan. Wills
ultimately graduated from Brown and later enrolled in medical
school in Pennsylvania.
In December 1995, just short of three years after her
meeting with Adesogan, Wills filed a complaint in district court
against Brown and Adesogan. The complaint set forth eight counts
against Brown, Adesogan, or both, under state law (counts I through
VIII) and two further federal claims against Brown under Title IX,
one designated "hostile environment sex harassment" (count IX) and
the other designated "quid pro quo sex harassment" (count X). 
Adesogan never responded, and the case proceeded solely against
Brown. A default judgment in the amount of $275,000 was later
entered against Adesogan.
In due course, Brown moved for summary judgment as to all
counts against it. Following a hearing on November 24, 1997, the
district court granted summary judgment in Brown's favor as to the
claims for negligent hiring (count II), negligent retention (but
not negligent supervision, which was a part of the same count III),
negligent entrustment (count IV), and intentional and negligent
infliction of emotional distress (counts V and VI). Thereafter,
the court denied summary judgment on Wills's claims based on a
hostile environment theory of sex discrimination. This theory was
explicitly set forth in count IX based on Title IX (and by
implication in count VII under the state civil rights statute).
This disposition left for trial four separate claims
against Brown: assault and battery (count I), negligent
supervision (count III), and sex discrimination based both on a
hostile environment and a quid pro quo theory (counts IX and X). 
Trial began on March 19, 1998, and when Wills rested her opening
case, the district court granted Brown's motion for a directed
verdict only as to the assault and battery claim and the quid pro
quo sex discrimination claim. Fed. R. Civ. P. 50(a). Following
further evidence, the negligent supervision and hostile environment
claims were submitted to the jury.
On March 31, 1998, the jury returned a verdict in Brown's
favor on both claims. Thereafter Wills filed a post-trial motion
seeking judgment notwithstanding the verdict and, alternatively, a
new trial on these same claims. Fed. R. Civ. P. 50, 59. The
district court denied Wills's motion and entered judgment in favor
of Brown. Wills now appeals, challenging (in her main argument)
the district court's exclusion of evidence on her hostile work
environment claim which was rejected by the jury. She also attacks
the district court's grant of summary judgment on three of the
state tort claims, its grant of directed verdicts on her assault
and battery and her quid pro quo claims, and its denial of a new
trial on the two claims rejected by the jury.
1. Title IX forbids schools that receive federal funding
from discriminating against students "on the basis of sex." 20
U.S.C. 1681(a). Starting from the now-accepted premise that
sexual harassment can constitute sex discrimination, Meritor
Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986), the Supreme Court
has endorsed two different, although related, theories as to how
such harassment can constitute sex discrimination either in the
workplace (Title VII) or school context (Title IX).
One theory, popularly known as "quid pro quo" harassment
or discrimination, occurs most often when some benefit or adverse
action, such as change in salary at work or a grade in school, is
made to depend on providing sexual favors to someone in authority,
Lipsett v. University of Puerto Rico, 864 F.2d 881, 898 (1st Cir.
1988); the other theory, under the rubric "hostile environment,"
applies where the acts of sexual harassment are sufficiently severe
to interfere with the workplace or school opportunities normally
available to the worker or student. Meritor, 477 U.S. at 66; Davis
v. Monroe County Bd. of Educ., 119 S. Ct. 1661 (1999). In this
case, Wills advanced both theories against Brown--one in count IX
and the other in count X. But the evidence now in dispute was
offered as support for the hostile environment claim (the quid pro
quo claim never reached the jury). 
Broadly speaking, a hostile environment claim requires
the victim to have been subjected to harassment severe enough to
compromise the victim's employment or educational opportunities
and, in the case of a Title IX claim (but not under Title VII), the
institution must have had actual knowledge of the harassment and
have exhibited deliberate indifference to it. Gebser, 118 S. Ct.
at 1997-99. If the institution takes timely and reasonable
measures to end the harassment, it is not liable under Title IX for
prior harassment. Id. Of course, if it learns that its measures
have proved inadequate, it may be required to take further steps to
avoid new liability.
From the outset, Wills's main claim based on a hostile
environment theory has been that Wills was harassed by Adesogan on 
December 9, 1992, and that Brown is responsible for Adesogan's
wrongdoing under Title IX because Brown had prior notice of the
earlier Schleussner episode but did nothing to prevent the threat
to other students such as Wills. Wills wanted the jury also to
know that after her own harassment on December 9, Brown did not
immediately remove Adesogan from the faculty or otherwise take
action beyond the reprimand; and, far more important, she wanted it
to know that Brown later received additional complaints from others
in 1993 and 1994 that Adesogan had harassed a half-dozen or more
additional victims. The admissibility issue was presented and
resolved in limine.
In excluding the evidence, the district judge reasoned
that if Brown had sufficient prior knowledge of the Schleussner
episode--and this was a fact question--then it was responsible for
Adesogan's action on December 9, 1992, regardless whether it later
took adequate remedial steps and regardless whether it got later
complaints from other students. Conversely, even if the remedial
steps were inadequate and other students were later harassed, this
did not create liability on Brown's part for Adesogan's harassment
by Wills on December 9, 1992, before the reprimand and before the
complaints received in 1993 and 1994. On this theory, the judge
drew a sharp line between what happened before and after December
9, 1992.
At different times, Wills has offered different theories
as to why the post-December 9 evidence in question is relevant to
Brown's liability, but the argument principally made in the
district court--and the only argument fairly developed in her
opening brief in appeal--is this: the showing of an inadequate
response to harassment is a standard issue in Title IX litigation
and (says Willis) she was therefore entitled to show that Brown's
response in December 1992 was inadequate and failed to prevent the
harassment of other students thereafter. Wills has cited
throughout a set of cases, including one of our own, where
inadequate response evidence was central. See, e.g., Gebser, 118
S. Ct. at 2000; Lipsett, 864 F.2d at 902-07. 
The difficulty for Wills is that evidence of an
inadequate response is pertinent to show fault and causation where
the plaintiff is claiming that she was harassed or continued to be
harassed after the inadequate response. See Gebser, 118 S. Ct. at
1999; Lipsett, 864 F.2d at 907. But here, as already noted,
Wills's claim was of a single specific harassment incident that
occurred before the reprimand and the later complaints (albeit one
that caused continuing damages). There is no mechanical rule that
makes such evidence relevant or irrelevant in the abstract:
relevance depends on the facts and the theory of the case being
pressed.
Here, in relation to Brown's liability for the December
9 incident, the reprimand evidence was perhaps thinly relevant
because, although it had nothing to do with whether Brown had prior
notice before December 9 or whether Adesogan's behavior on that
occasion violated the statute, it could arguably have been admitted
as casting some backward light on Brown's general attitude--and
therefore on the issue whether Brown was "deliberately indifferent"
in its handling of the Schleussner claim and the resulting exposure
of other students, including Wills, to Adesogan's behavior. But
the reprimand was at best marginal to the main issues at trial--the
key evidence on "deliberate indifference" was what Brown knew and
what it did in response to Schleussner's complaint--and, taken
alone, the reprimand was more favorable to Brown than to Wills
(Brown wanted it in evidence). As it happens, the jury later
learned that Adesogan had not been fired until 1994.
Wills's real hope was the evidence as to later claims
made by other students, Brown's arguably casual treatment of the
Sanford claims in January 1994, and the obvious harm inflicted on
others by Adesogan's continuing depredations. Yet, this evidence
is even more remote to Brown's general attitude in 1992, had a
potential for severe prejudice, and would have required the trial
to explore circumstances surrounding claims and acts of harassment
of other victims which--unlike the Schleussner episode--had nothing
to do with the vital question whether Brown had notice prior to
December 1992.
In her reply brief on appeal, Wills offers a different
theory entirely. In effect, she asserts that Adesogan's harassment
of her continued after December 1992 because Adesogan remained as
a teacher and Wills was shocked and upset to find him in January
1994 as her teacher in new chemistry course. Her deposition gives
a somewhat tamer description of her reaction, but in any event
Wills was not required to take any course from Adesogan. Wills's
other exposure to Adesogan was a chance glimpse of him in a
drugstore at some earlier, unidentified point.
It is sufficient answer that theories offered for the
first time in the reply brief are not preserved. Executive Leasing
Corp. v. Banco Popular, 48 F.3d 66, 67-68 & n.3 (1st Cir. 1995). 
Indeed, it is doubtful that Wills said enough in the district court
to preserve the argument for appeal; at best, there are a few
hints. But even if preserved below, the argument has to be renewed
in the opening brief on appeal, so that the appellee has a chance
to respond. Reply briefs are to counter the appellee's arguments,
not to offer new theories of error for the first time. 
Nevertheless, Wills's belated continuing harassment
theory is a very weak one on these facts. On some cases, merely to
maintain a harasser in a position of authority over the victim,
after notice of prior harassment, could create new liability. But
it would not be easy to describe Adesogan's mere presence on a
large campus as harassment of Wills, or to describe Brown's
reasonably firm reprimand as representing "deliberate indifference"
under Davis. 119 S. Ct. at 1673. Brown's treatment of Sanford's
January 1994 complaint is a closer question on the latter issue,
but even here Sanford's request for anonymity is not irrelevant and
the connection to Wills is slight.
However, we need not decide whether this continuing
harassment theory could be made to work on the present facts. Even
if this theory was fairly presented to the district judge which we
doubt--Wills did argue that she had suffered damages after December
1992 but that is a quite different matter--it was not preserved on
appeal. Needless to say, this conclusion is not an endorsement of
Brown's handling of the Adesogan debacle, which was remarkably
inept even when one appreciates that there are due process values
for the professor and concerns about student anonymity that help
shape university procedures. 
Wills's remaining evidentiary claims can be briefly
answered. She complains that in a non-responsive answer to a
question from Wills's counsel, one of the Brown officials testified
that Brown had fired Adesogan, and Wills then brought out the fact
that he was not fired until March 1994. The district court did not
permit further inquiry, and Wills now says that she was "severely
prejudiced" by the non-responsive answer and wrongly deprived of
the opportunity to explain to the jury that the reason he was fired
was "for sexually assaulting nearly seven women in one week."
But telling the jury that Adesogan had been fired in 1994
was hardly harmful to Wills: it showed that Brown did not fire
Adesogan in December 1992--the very point that Wills says she was
so anxious to present to the jury to show the inadequacy of the
reprimand--and it probably indicated to the jury that Adesogan's
behavior was even worse than it had already been led to believe by
Wills's own testimony. The reasons for excluding the March 1994
harassment incidents has already been discussed.
Finally, Wills complains that she was prevented from
offering testimony from two students, Tilly Gurman and Eve
Zaritsky, who were ready to testify that Adesogan had harassed them
in the fall of 1992. Gurman admittedly did not report the incident
to Brown until September 1993, and there is no indication that
Zaritsky ever reported her allegations. Nothing supports Wills's
argument on appeal that the evidence should have been admitted
because it increased the likelihood that Brown knew of these
incidents prior to December 1992 and was therefore more culpable
for failing to remove Adesogan prior to the December 1992 incident
with Wills. One other objection to testimony involving former
Brown dean, Toby Simon, is not worth discussing.
2. We turn now to Wills's remaining claims of error,
starting with the district court's grant of summary judgment as to
three of her ten claims: intentional infliction of emotional
distress, negligent hiring, and negligent retention. Wills has not
appealed from the grant of summary judgment as to the negligent
entrustment claim. All four of the these claims are governed by
Rhode Island law.
Starting with intentional infliction of emotional
distress, the tort requires "extreme and outrageous" conduct that
"intentionally or recklessly" causes severe emotional distress,
which must include some physical symptoms. Andrade v. Jamestown
Housing Authority, 82 F.3d 1179, 1187 (1st Cir. 1996); Elias v.
Youngken, 493 A.2d 158, 163-64 (R.I. 1985). Wills's opening brief
simply asserts in a few sentences that Brown's conduct was extreme
and outrageous because it ignored student complaints of sexual
harassment by Adesogan and thereby "allowed Adesogan to assault Ms.
Wills unfettered." 
The only knowledge that Brown was shown to have had
before the "assault" was the Schleussner incident, but it is common
ground that Schleussner did not want to file a formal complaint. 
Very difficult problems are posed in balancing a student's request
for anonymity or limited disclosure against the need to prevent
future harassment. Viewed in retrospect, Brown's procedures left
much to be desired. But there is nothing to the notion that Brown
was behaving outrageously when it failed to pursue the Schleussner
complaint beyond the limited informal measures instigated by
Schleussner herself.
Under Rhode Island law, an employer is required to
exercise reasonable care in selecting its employees. Welsh Mfg.,
Dir. of Textron, Inc. v. Pinkerton's, Inc., 474 A.2d 436 (R.I.
1984). Wills says that Brown made no search of Adesogan's
background before hiring him as a visiting professor beyond a look
at his work and resume and an inquiry to one of his colleagues. 
Whether more was reasonably required does not matter because Wills
pointed to no evidence that a more searching inquiry by Brown in
Nigeria or elsewhere would have alerted it to the problem he posed. 
The district court dismissed the claim on this ground and Wills
simply ignores this issue on appeal.
Wills last argument, as to summary judgment, is that the
district court should not have stricken the reference to
"retention" in her count claiming negligent supervision and
retention. The district court struck the retention language
because it said that no authority had been provided for such a
claim under state law and it thought that the multiplicity of
locutions was confusing. The court also said that there was no
basis for finding Brown negligent in not firing Adesogan prior to
December 1992 and that the only plausible claim was for negligent
supervision, which the court sent to the jury.
Assuming for the moment that there is a separate state
law claim under state law for negligent retention, the two claims
on these facts are very close and lack of adequate supervision is
certainly the stronger of the two. Indeed, on appeal--in the very
brief passage addressed to this issue--Wills muddles her two
theories by arguing that "Brown did not supervise or monitor"
Adesogan, or give him sexual harassment training or counseling,
even after he was put on probation. On the present facts, we are
not persuaded that Wills adequately explained her separate
"retention" theory or was prejudiced by its omission.
The remaining substantial objections are to the district
court's grant of a directed verdict in favor of Brown on two other
counts: the quid pro quo theory of sexual harassment under Title IX
and the assault and battery claim under state law. The test, in
both cases, is whether a reasonable jury could on the evidence
presented find in favor of Wills, resolving doubts and credibility
issues in her favor; and our review on this issue is de novo. 
Combustion Eng'g, Inc. v. Miller Hydro Group, 13 F.3d 437, 441 (1st
Cir. 1993).
The quid pro quo theory presents the more complicated
issues and we begin with it. Quid pro quo cases normally involve
situations in which someone with authority over the victim inflicts
a penalty or withholds a benefit to obtain sexual favors, Lipsett,
864 F.2d at 898, and it is easy to understand why the district
judge doubted that this case fell into that category. Wills was
not a student of Adesogan in December 1992, he had no authority
over her grade, he never said anything that conditioned her grade
or his tutoring services on Wills's agreeing to submit to his
advances, and--as the district court pointed out--she did not
testify that she understood Adesogan to be making to such a threat. 
Accordingly, the judge withdrew this theory from the jury.
We are not certain that we agree with the district
court's reasoning, although the question may be a close one and
need not be finally resolved here. Patently, Wills' stronger claim
was for hostile environment and the quid pro quo claim is a
stretch. Indeed, in Ellerth, the Supreme Court recently spoke of
the "limited utility" of distinguishing between quid pro quo
"threats that are carried out" and "bothersome attentions" so
severe as to create a hostile environment. 118 S. Ct. at 2264. 
But at present the categories remain and, if they are to be
entirely elided, it is for the Supreme Court to do so. Thus, our
question is one of evidence.
Here, it could be argued that while Adesogan had no
authority over Wills's grade, informal tutoring is a benefit of
Brown's offering; Adesogan's hugging and touching effectively cost
Wills the opportunity for further tutoring from Adesogan; and it
does not matter whether Adesogan expressed such a threat or whether
Adesogan or Wills so interpreted the situation. Certainly threats
need not be explicit, see Lipsett, 864 F.2d at 913; Sanders v. Casa
View Baptist Church, 134 F.3d 331, 339 (5th Cir. 1998), and it is
probably an open question under the case law whether this kind of
benefit (informal tutoring from a professor not the student's
teacher) is enough to create liability under a quid pro quo
theory. But even if we assume dubitante that there was enough
evidence to get to the jury on a quid quo pro claim, there is no
way that such an instruction could have altered the outcome here. 
Sometimes the quid pro quo and hostile environment
theories connect to markedly different facts. Imagine a quid pro
quo case where a raise is denied to the employee because the
employer was turned down on a simple request for a date; and
contrast a hostile environment claim based on crude sexual remarks
from fellow employees. But on our facts, the theories effectively
overlap: the only sense in which a benefit was denied was that
Wills felt so uncomfortable in the environment that Adesogan had
created that she herself refused to avail herself of his tutoring. 
This essentially common issue explains why, in this case, the
difference between the two theories tends to disappear. Cf.
Ellerth.
Brown chose in its closing argument to focus primarily on
the lack of notice to Brown based on the Schleussner episode,
arguing that there was a conflict between Tanenbaum and Schleussner
on the issue and that Tanenbaum should be believed. Secondarily,
Brown argued that Wills had not been damaged. Either theory would
also dispatch the quid pro quo claim but the jury may have adopted
neither of these arguments; during jury deliberations it asked the
judge to further explain the concept of hostile environment. He
declined to elaborate, and a general verdict followed in favor of
Brown so we do not know on what ground the jury actually resolved
the matter.
However, even if the jury found both notice and damage,
a jury that (improbably) thought Adesogan's actions too mild to
create a hostile environment could not easily have concluded that
Wills had been denied the benefit of Adesogan's tutoring. Thus, on
the realistic assessment we are asked to make under the harmless
error doctrine, there is no practical likelihood that the weaker
quid pro quo claim would have prevailed before a jury that rejected
the stronger (and manifestly more applicable) hostile environment
claim. On our facts, the refusal to instruct on quid pro quo,
assuming arguendo that it was error, was harmless.
This brings us to Wills's claim that the district court
erred in directing a verdict on the assault and battery charge. 
Since Adesogan's conduct could easily be viewed as assault, the
directed verdict turned on whether Brown could be held liable 
under Rhode Island law for the intentional tort of assault by
Adesogan, Brown's employee. Wills argues that under Rhode Island
law, a jury could find Brown liable for Adesogan's offensive
touching of Wills on December 9, 1992, because it occurred during
the course of an activity that he was hired to perform, namely, the
instruction of students. The district judge ruled that this was
not the law of Rhode Island.
Although (surprisingly) we are not entitled to give
special weight on this issue to the experience of the district
judge with Rhode Island law, Gibson v. City of Cranston, 37 F.3d
731, 735 (1st Cir. 1994), the cases confirm his conclusion. In
Rhode Island, an employer is not liable for an assault by its
employee merely because it occurred during the course of employee's
work. Labossiere v. Sousa, 143 A.2d 285 (R.I. 1958) (no liability
where waitress pushed customer). Rather, where the employer has
not actually authorized the assault, conduct must itself be a
reasonable and foreseeable incident of the employee's duties. 
Bryce v. Jackson Diners Corp., 96 A.2d 637 (R.I. 1953) (store
manager sought to restrain a customer trying to leave without
paying).
Obviously, it was no part of Adesogan's duties to hug and
grope students who came to him for tutoring. Rhode Island could
easily extend liability for intentional torts more broadly and may
have done so by statute in some situations. But it has not done so
for assault, and the line drawn by Labossiere and Bryce remains in
force. Drake v. Star Market Co., Inc., 526 A.2d 517 (R.I. 1987). 
Accordingly, the assault claim was properly withdrawn from the jury
because--fully accepting Wills's version of events--Adesogan but
not Brown was liable for the assault under state law.
Wills's final ground for appeal is the district court's
denial of her motion for new trial on the two remaining claims
(hostile environment and negligent supervision) rejected by the
jury. The district court's discretion in granting or denying a new
trial is very broad and the arguments made by Wills are in
substance some of the same claims we have already addressed (and no
others). This was surely a close case on the claims that went to
the jury and it could easily have been resolved in Wills's favor,
but juries are there to decide close cases, and nothing required
the district judge to afford Wills a new trial.
The judgment of the district court is affirmed. Each
side shall bear its own costs on the appeal.
It is so ordered.

- Dissent Follows -
LIPEZ, Circuit Judge, dissenting. This is a vexing case
for many reasons. The facts are difficult. The applicable law is
complex and evolving. Struggling with these unruly elements, the
trial court imposed a simple but erroneous limitation on Wills's
Title IX hostile environment claim by taking an unduly restrictive
view of the relevant evidence. Wills's articulation of this
hostile environment claim, both at trial and on appeal, was not a
model of clarity. The waiver issue on appeal is a close one. In
the end, however, despite the thoughtful analysis of my colleagues,
I cannot agree that Wills waived on appeal her claim that Brown is
liable for hostile environment sex discrimination on the basis that
Brown failed to respond adequately to the hostile educational
environment created by Adesogan's assault on her and by his
continuing presence in the classroom after that assault. That
conclusion requires me to explain why I believe that Wills is
entitled to a new trial on her claim.
I. Waiver
The discussion of the waiver issue on appeal requires an
understanding of Wills's presentation of her hostile environment
claim to the trial court. Wills presented a hostile environment
claim that was premised, in part, on Brown's liability for the
December 9, 1992 assault. The district court allowed this claim to
go to the jury and she fairly lost on it. But Wills also presented
a separate hostile environment claim that was premised on Brown's
liability for its inadequate response to the hostile educational
environment which arose for Wills following the December 9 assault. 
For the purposes of this claim, Wills consistently maintained that
subsequent events evidence (events following the December 9, 1992
assault) was relevant to establishing Brown's liability. 
Beginning with her complaint, Wills alleged that as a
result of Adesogan's sexual assault, she was
deprived . . . of the opportunity to receive
the full benefit of her education during the
relevant period at Brown University. Brown
knew or should have known of the environment
created by Adesogan and failed to take proper
remedial action to eliminate the harassment
caused by Adesogan and inflicted upon Wills.

In her memorandum in support of her Motion for a Partial Summary
Judgment, Wills argued, inter alia, that a single incident of
sexual harassment can be severe enough to give rise to a hostile
environment and that Adesogan's assault on her was "sufficiently
severe or pervasive to alter her education and create an abusive
educational environment. . . ." Later, during a pre-trial hearing,
Wills requested additional time to conduct discovery on issues
pertaining to Brown's response to her notice of the assault. She
argued that
one of the issues in this case is whether
Brown took prompt remedial action. Brown is
taking the position that one of the pieces of
evidence of the fact that they took prompt
remedial action is that Ms. Wills was
satisfied with what they did. Well, when
Brown promises that they are going to give her
an advocate to help her figure out what's
appropriate, was inappropriate, whether she
should be satisfied with what her options are,
I'd like to inquire why that didn't happen
when that is their policy.

The court took a different view of the relevance of such
evidence: 
I think we are coming back to this fundamental
disagreement that we seem to have. I thought
I had ruled on this and put this to rest, but
it keeps resurfacing that I recognize that
your position is that what Brown may have done
or not done after the alleged assault
described by Ms. Wills is relevant to this
case. And I think, I thought I had ruled that
in my view it is not relevant. It would be
relevant if there were a second assault on Ms.
Wills that resulted from Brown's inaction then
it certainly would be relevant, but what is
relevant, what this case focuses on is what
Brown knew prior to the assault on Ms. Wills
and what it did or didn't do to prevent that
assault from taking place.

(emphasis added). The court's reference to the relevance of a
second assault on Wills is particularly important. The court
recognized that even if Wills could not prove that Brown knew of
the assault by Adesogan on Laura Schleussner, and hence could not
establish that Brown should have prevented Adesogan's assault on
her, she would still have a claim against Brown for hostile
environment discrimination based on the inadequacy of Brown's
response to her report of a sexual assault, but only if Adesogan
assaulted her a second time. The court did not accept the
proposition that the hostile environment could be the product of
events that flowed from the single assault by Adesogan, including
Wills's reaction to the assault and Adesogan's continuing presence
in the classroom.
Despite the court's exclusion from Wills's case of
liability evidence subsequent to the December 1992 assault, Brown
still felt the need in its oral motion for a judgment as a matter
of law at the close of Wills's case to argue that the evidence
failed to prove that the assault, although severe, "alter[ed] her
educational environment." The background for Brown's concern was
a footnote in a First Circuit case, Brown v. Hot, Sexy and Safer
Productions, Inc., 68 F.3d 525 (1st Cir. 1995), in which we said
that "we do not hold that a one-time episode is per se incapable of
sustaining a hostile environment claim." Id. at 541 n. 13. In
response to Brown's insistence that a hostile environment could not
be established by the single incident described by Wills, the court
queried:
You're not saying that this incident wasn't a
severe incident. It isn't the severity of the
incident, but rather you're saying that no
matter how severe the evidence doesn't show
that it affected Ms. Wills' educational
environment?

Brown responded:

Correct, your honor. Adesogan clearly acted
in an inappropriate manner and the conduct was
severe. The question, as I understand it, is
whether or not it altered her educational
environment. And I saw no evidence suggesting
that. She functioned very well at Brown, she
graduated with a good GPA. Was able to move
on in life. 

The court then made this observation:

My question to you is, I guess what the
question you have raised is what constitutes
an educational environment. It doesn't sound
like you dispute that that would be a highly
offensive, despicable, almost every pejorative
word you can think of, and you seem to be
suggesting that educational environment means
that it's got to carry over into the future
and have some tangible effect ---.

(emphasis added). Brown responded again:

Your honor, that's my interpretation, and I
would not disagree with the court that this
single incident was inappropriate, the
professor behaved in a severe manner, but the
question is how we hold the institution liable
and what's the education environment, and I
would respectfully suggest to the court that
you have to look beyond the single incident,
otherwise it is a per se rule creating a
hostile environment by this one inappropriate
action. 

At this juncture, the court and Brown both recognized that evidence
of Brown's liability for a hostile environment subsequent to the
assault by Adesogan on Wills must include evidence beyond the
assault itself. Yet that was the very liability evidence that the
court had not permitted Wills to introduce.
In response to this colloquy between the trial court and
Brown, Wills's counsel attempted to again call attention to the
existence of the hostile environment occurring after the assault,
focusing on Wills's inability to take advantage of education
opportunities on campus. She explained:
But I believe the testimony in this case was
that this incident impacted Ms. Wills' ability
to study. She took an incomplete in the
class. It impacted her ability to function in
the following class and so, therefore, the
incident, the single incident created for her
a hostile environment, her hostile educational
environment for Brown . . . .
Despite its intimations of interest at the close of
Wills's case, the court ultimately rejected any claim for hostile
environment discrimination based on Wills's experiences or Brown's
response after the December 1992 assault:
My ruling has consistently and clearly been
that evidence of what occurred after the
alleged assault on Ms. Wills is irrelevant in
this case. So I would not allow the evidence
on these grounds.
And you can mark for identification
that you say the offer of proof would consist
of. If you would like to respond in some way,
Mr. Richard, I will give you that opportunity. 
Frankly, I don't see what difference it is
going to make, because if this becomes an
issue on appeal and the Court of Appeals
concludes that this kind of evidence was
admissible and might have influenced the
outcome, then presumably it would grant a new
trial. If it concludes that it wasn't
admissible, and it won't, and I don't think it
is going to make a great deal of difference
exactly what the incidents are alleged to
consist of, but I will leave it up to you Mr.
Richard.

After the verdict, Wills reiterated in her motion for a new trial
that the trial court "prevented [her] from showing Brown failed to
take appropriate action to end the harassment. Therefore, [she]
could not prove one of the elements she was required to prove under
Lipsett to establish Brown's liability for hostile environment
sexual harassment."
Despite Wills's arguments to the contrary both before and
throughout the trial, the court took the position that, absent a
second physical assault by Adesogan on Wills, or some form of
direct harassment, Wills had no claim for sex discrimination
against Brown occurring after December 9, 1992. In taking that
narrow view of hostile environment discrimination, the district
court failed to recognize that Wills's educational experiences at
Brown could be altered significantly by a hostile educational
environment resulting from Adesogan's assault on her and his
continuing presence in the classroom. That failure, in turn,
prompted the court to consistently reject all attempts by Wills to
introduce evidence of events following the assault on Wills to
establish Brown's liability for hostile environment discrimination. 
In Wills's opening brief on appeal, she focused, inter
alia, on the school's response to her complaint: 
To determine institutional liability under
either Lipsett or Gebser, a trier of fact must
look to an institution's response once it
learns of sexual harassment. Ms. Wills
submits that to determine whether an official
took "appropriate steps to halt" the
harassment (Lipsett) or whether an official
with authority to institute corrective
measures was 'deliberately indifferent to the
teacher's misconduct' (Gebser), the trier of
fact must examine the institution's response
to the complained-of-harassment. This
includes an assessment of the action taken
against the harasser as a result of the
harassment and whether the harassment stopped. 
Further, the Supreme Court, many years ago,
made clear the determination of a hostile
environment must be based on 'the totality of
the circumstances.' As a result of the
district court's misapplication of the law in
this case, it precluded the parties from
introducing evidence, and specifically
precluded Ms. Wills from showing Brown's
action against Professor Adesogan as a result
of Ms. Wills' assault did not end the
harassment. . . . Accordingly, Ms. Wills was
not allowed to show a failure to properly
address the harassment, considering the
totality of the circumstances.

In elaborating on this "totality of the circumstances" view of
hostile environment discrimination in her opening brief, Wills
focused far too much attention on the trial court's alleged error
in excluding evidence of Adesogan's sexual assaults on other female
students at Brown before and after the assault on Wills, without
relating that evidence to her own experience of a hostile
environment at Brown. She did not refer explicitly to her claim
that the "totality of the circumstances" of a hostile environment
included her reaction to the assault on her by Adesogan and his
continuing presence in the classroom.
In her reply brief, Wills referred to the continuing
presence claim more clearly: "Wills continued to suffer harm after
Adesogan sexually assaulted her due to his continued presence on
campus without any real imposition of discipline for his egregious
conduct toward her." She then elaborated:
Wills has standing to challenge Brown's
remedial action taken after December 9, 1992,
as she was mistreated by Brown when she
reported the acts of Adesogan, and continued
to suffer harm after that date as a result of
Adesogan's continued presence on the campus
with unbridled authority to interact with
students, including Wills. In addition, Wills
has standing to challenge Brown's remedial
action . . . as Brown had actual notice of
Adesogan's misconduct and did not halt the
harassment.

Brown never filed a motion to strike this portion of Wills's reply
brief as unfairly presenting a new issue. At oral argument there
was extensive discussion of the hostile environment claim and the
propriety of the district court's decision to exclude all post-
December 9, 1992 evidence. In both Wills's argument and Brown's,
there were inquiries about Wills's continuing presence claim of
hostile environment discrimination. Instead of arguing that Wills
had waived this claim by not raising it in her opening brief, Brown
addressed the claim on its merits, arguing that there was no
further harassment of Wills by Adesogan following the assault, and
that the trial court was correct to exclude any liability evidence
subsequent to the December 9, 1992 assault. Brown's only effort at
oral argument to avoid the merits of Wills's hostile environment
claim involved an assertion, also set forth in its brief, that
Wills never made an offer of proof regarding Brown's conduct
following the assault in response to her complaints not that
Wills had waived any argument on appeal. In my view, these
exchanges demonstrate that the parties always understood, at trial
and on appeal, that Wills's claim of hostile environment
discrimination, rather than being limited to Brown's responsibility
for its failure to prevent Adesogan's sexual assault on Wills, also
included her claim that Brown was responsible for the hostile
environment discrimination she experienced after the assault
because of its severity and Adesogan's continuing presence in the
classroom. 
Without minimizing the deficiencies in the quality of
Wills's opening brief on appeal, I think there is a significant
difference between an argument that is waived and one that is
argued poorly. Wills argued her continuing presence claim of
hostile environment discrimination to the trial court. This
argument in the trial court fairly informs the reference to the
"totality of the circumstances" claim of hostile environment
discrimination set forth in her opening brief on appeal. She
returned in her reply brief to the explicit iteration of the
continuing presence claim of hostile environment discrimination
presented to the trial court. Brown never argued in writing or
orally that Wills had waived on appeal this claim of hostile
environment discrimination. Given the prominence of this claim
before the district court, its adequate explanation in the reply
brief, and the attention it commanded at oral argument, Wills's 
vague reference to it in her opening brief should not preclude our
consideration of this important issue.
II. Wills's Claim
There is no dispute that, following the incident on
December 9, 1992, Wills was never again physically assaulted or
verbally harassed by Adesogan. Nonetheless, Wills argues that
Adesogan's continuing presence on the faculty and in the classroom
created a hostile environment that altered the terms and conditions
of her educational environment, thereby establishing the basis for
a claim of sex discrimination against Brown under Title IX. The
majority recognizes that "in some cases, merely to maintain a
harasser in a position of authority over the victim, after notice
of prior harassment, could create new liability." This is an
important recognition. The majority also notes, however, that
Wills's "continuing harassment theory is a very weak one on these
facts." 
I think we should be wary of characterizing the strength
or weakness of a case that Wills was never allowed to develop fully
because of the exclusionary rulings of the trial court. 
Nevertheless, given what we do know of Wills's case from pre-trial
submissions and arguments before the trial court, I think she
offered the outlines of a plausible claim of continuing presence
hostile environment discrimination that she was entitled to present
to a jury. I therefore agree with Wills that the trial court erred
in excluding any evidence of Brown's liability for hostile
environment discrimination based on Brown's response to Wills's
complaint of a sexual assault by Adesogan and its response to other
information and events subsequent to December 9, 1992. I must
explain that position more fully.
A. Title IX and Gebser v. Lago Vista Independent School District
Title IX provides that "[n]o person . . . shall, on the
basis of sex, be excluded from participation in, be denied the
benefits of, or be subjected to discrimination under any education
program or activity receiving Federal financial assistance." 20
U.S.C. 1681(a). Title IX imposes an obligation on educational
institutions receiving federal funds to refrain from denying
educational opportunities on the basis of sex. Title IX is
enforceable through an implied private right of action against an
educational institution. See Cannon v. University of Chicago, 441
U.S. 677 (1979). That action can include a demand for monetary
damages. See Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60
(1992).
When Wills brought her case against Brown in 1995, there
was uncertainty about the standards of liability for educational
institutions under Title IX. The Supreme Court ended this
uncertainty in Gebser v. Lago Vista Independent School District,
rejecting institutional liability based on agency principles or
constructive notice to establish institutional liability. See
Gebser v. Lago Vista Indep. Sch. Dist., 118 S. Ct. 1989, 1999
(1998). The Court explained that Title IX creates obligations that
are contractual in nature, "conditioning an offer of federal
funding on a promise by the recipient not to discriminate." Id. at
1997. The focus of Title IX is on "protecting individuals from
discriminatory practices carried out by recipients of federal
funds." Id. This focus differs from Title VII, which prohibits sex
discrimination without regard to federal funding. See id. On the
basis of the distinct purpose of Title IX, the Court concluded
that: 
[I]n cases . . . that do not involve official
policy of the recipient entity, we hold that a
damages remedy will not lie under Title IX
unless an official who at a minimum has
authority to address the alleged
discrimination and to institute corrective
measures on the recipient's behalf has actual
knowledge of discrimination in the recipient's
programs and fails to adequately respond. 
We think, moreover, that the response
must amount to deliberate indifference to
discrimination.

Id. at 1999.
Accordingly, in a Title IX action, a plaintiff must
allege that the recipient of the federal funds - the educational
institution - was deliberately indifferent to discrimination on the
basis of sex. To establish the institution's liability, a
plaintiff must show that the school had "notice" of the alleged
discrimination. See id. Even if the school had notice of the
alleged discrimination, it is not liable for a Title IX violation
unless its response amounted to "deliberate indifference to
discrimination." See id.
B. The continuing presence claim of sex discrimination
Sex discrimination in education involves the denial of
educational benefits or the alteration of conditions of the
educational environment on the basis of sex. See Davis v. Monroe
County Bd. of Educ., 119 S. Ct. 1661, 1675 (1999). If sufficiently
severe, sex harassment, a form of sex discrimination for the
purpose of Title IX, "can be said to deprive the victims of access
to the educational opportunities or benefits provided by the
school." Id. The denial or alteration can be the result of
inappropriate touching, see Canutillo Indep. Sch. Dist. v. Leija,
101 F.3d 393, 395 (5th Cir. 1996), the solicitation of sexual
favors in return for educational rewards, see Miller v. Kentosh,
No. Civ. A. 97-6541, 1998 WL 355520 (E.D. Pa. June 29, 1998), a
pattern of coercive sexual relations between a student and a
teacher, see Franklin, 503 U.S. at 63, or a pattern of severe
student on student sexual harassment, see Davis, 119 S. Ct. at
1673. The effect of such abusive conduct on a victim does not
necessarily end with a cessation of the abusive conduct,
particularly if the victim and the abuser retain the same or
similar roles in an educational institution. In some cases, the
continuing presence of the harasser may so alter the terms and
conditions of education that the victim of harassment may be able
to establish a claim for sex discrimination.
In Gebser, a student who had been involved in a sexual
relationship with her teacher sued the school district under Title
IX. Once the school was given notice of the sexual relationship
between the student and teacher, the school immediately fired the
teacher. Therefore, the Court had no occasion to consider the
relationship between the continued presence of the teacher in the
school and altered conditions of education. However, in Patricia
H. v. Berkeley Unified School District, 830 F. Supp. 1288 (N.D.
Cal. 1993), a district court squarely addressed this issue.
Patricia H. brought suit against the school district on behalf of
her daughters. Patricia H. had been involved with a teacher in the
school district (Hamilton) who, she alleged, molested both of her
daughters while Patricia H. and Hamilton were dating. Patricia H.
filed criminal charges against Hamilton. The school district
placed Hamilton on a leave of absence without pay, and then
suspended him. The criminal charges were ultimately dismissed,
subject to Hamilton's participation in rehabilitation programs and
psychological counseling, and his license to teach was reinstated. 
Hamilton resumed teaching music classes, which he taught throughout
the school district, including those schools attended by Patricia
H.'s two daughters. On cross-motions for summary judgment, the
court was asked to consider whether "the mere presence of Hamilton
as a teacher, a figure of authority and respect, in the schools
[the two daughters] were attending, or would have attended but for
his presence, created a hostile environment that deprived them of
full enjoyment, and during the semesters of their absence, any
enjoyment, of their education within the [school district]." Id. at
1296. The court concluded that 
[t]he very severity of the molestation, and
the grave disparity in age and power between
the girls and [the teacher], suggests that a
reasonable student, having experienced such an
assault, would be intimidated and fearful of
[the teacher's] presence at her school, so
much so that her fear would interfere with her
ability to learn, and to enjoy all aspects of
her education fully, even though the alleged
molestations were isolated in time and
occurred outside of the school setting. The
Court is unable to declare, as a matter of
law, that [the students] did not experience a
hostile environment in the [school district].
The Court, however, also cannot declare that,
as a matter of law, a hostile environment did
exist. The question, whether a reasonable
female student of [the student's] age, having
experienced the harassment she alleges, would
find [the teacher's] mere presence at [the
school] created a hostile environment, is one
question for the jury.

Id. at 1296-97 (footnotes omitted).
The proposition that the presence of a harasser can rise
to the level of hostile environment sex discrimination finds
support in the Title VII context. In Ellison v. Brady, 924 F.2d
872, 883 (9th Cir. 1991), the plaintiff alleged, inter alia, that
her employer's decision to allow an employee who had formerly
harassed her to transfer back into her office, after a six-month
"cooling-off period," created a hostile work environment. The
court accepted the plaintiff's argument, concluding that "[w]e
believe that in some cases the mere presence of an employee who has
engaged in particularly severe or pervasive harassment can create
a hostile work environment." Id. The court noted that there may be
situations where an employer can only fully remedy the harassment
by removing the harasser from the work environment. See id. at 883,
883 n.19.
C. The continuing presence claim of sex discrimination in this case

1. The hostile environment: the conduct of Adesogan
and its effect on Wills

Wills was enrolled in organic chemistry in the fall of
1992 because she planned to attend medical school. Because Wills
was having difficulty with the material, she went to see Adesogan
in his office for help on December 9, 1992 at 4:00 p.m., where she
found him meeting with another student. He told her to come back
at 5:30. When she returned, Adesogan looked up the grade on her
last exam and asked her why she had done so poorly. Wills told him
she had a lot of things going on at home and that she had not been
eating. He sent her off to get something to eat and told her to
come back at 6:30 since there was no way to study chemistry on an
empty stomach. When she returned at 6:30 and found the building
locked, she called up to Adesogan's office. He came down, let her
into the building, and they went upstairs to his office where
Adesogan shut the door. 
First, Adesogan asked her to join him in prayer. He
told her that he was glad she was a Christian and asked God to open
up her brain so that she could be more receptive to him and to
chemistry formulas and equations. Adesogan then worked with Wills
on chemistry problems until he announced that they needed a break
time for prayer. He then picked her up, put his arms around her
waist and sat her on his lap. As he "prayed" about Wills's eating
problems and her performance in organic chemistry, he allegedly put
his hand under her shirt, rubbed her stomach and touched her
breast. Wills explained that the first time he touched her breast,
his hand just grazed her body and she thought that maybe the
touching was an accident. After this "prayer" session they
returned to studying organic chemistry. About twenty minutes
later, he told her they needed to pray again and he again pulled 
Wills onto his lap. As he was touching her breasts and praying, he
told her: "I want you to understand there is no hanky panky stuff
going on - I want to be close to you like father-daughter." Again,
they returned to studying. The third time he pulled her onto his
lap for a prayer session and rubbed her breasts, he said: "Don't
let the Devil confuse Marketa into thinking that anything that went
on today was sexual." During each prayer session, which lasted
about seven or eight minutes, Adesogan sang religious songs.
The entire meeting lasted about an hour and forty-five
minutes. As she was leaving, Adesogan told Wills that she should
go to the small group sessions and that she should meet privately
with him before the exam. Together, they would be able to "get
it." Wills never went back to Adesogan's office, or to another
organic chemistry class that year.
As a result of Adesogan's continuing presence on the
faculty, Wills felt the need to avoid him, both on the college
campus and in her workplace. She delayed enrolling in the second
half of organic chemistry in an effort to distance herself from the
trauma of what had happened. When Wills ultimately enrolled in the
second half of organic chemistry in the spring of 1994, she
discovered that Adesogan was the only professor Brown had assigned
to teach the class, a fact she did not know until the day class
began. Wills immediately left the class. At trial, she testified
that "I probably tried to muster up some courage to go back to
class at least once or twice." Other than those occasions, she did
not return to the class for the rest of the semester.
In order to complete her pre-med studies, Wills had to
take the second semester of organic chemistry. The University sent
Wills a letter that spring offering her one of two options for the
second half of the organic chemistry class. She could request a
grade option change for the course, which would allow her to take
a pass in the course rather than a letter grade. As a pre-med
student, however, she was advised to first discuss this option with
one of the deans. Or, as the letter said, she could "cut her
losses," take an incomplete in the course and take the class again
in summer school, the tuition for which would be waived. The
school also offered to write her a letter that would
"contextualize" the difficulties she had experienced. Wills
completed the second semester of organic chemistry in summer
school. 
On these facts, I conclude that a reasonable jury could
find that: (1) Adesogan subjected Wills to severe sexual
harassment; (2) Wills experienced his continuing presence in the
classroom as a hostile environment that altered the conditions of
her education at Brown; and (3) a reasonable person subjected to
the harassment that Wills experienced would have had a similar
reaction to the continuing presence of Adesogan in the classroom. 
See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993);
Davis, 119 S. Ct. at 1674-75. 
The existence of a hostile environment, however, does not
necessarily subject an educational institution to liability under
Title IX. Liability only attaches where (1) the educational
institution has actual notice of the alleged discrimination, see
Gebser, 118 S. Ct. at 1999, and (2) the school's response to the
discrimination was "clearly unreasonable in light of the known
circumstances." Davis, 119 S. Ct. at 1674. When the educational
institution "does not engage in the harassment directly, it may not
be liable for damages unless its deliberate indifference subjects
its students to harassment. That is, deliberate indifference must,
at a minimum, cause the students to undergo harassment or make them
liable or vulnerable to it." Id. at 1672 (citations and quotation
marks omitted). I must therefore examine the issues of notice and
deliberate indifference.
2. Notice
The record is clear that Wills filed a written complaint
charging Adesogan with sexual harassment. That written complaint
was submitted to the Provost of Brown University, who was charged
with investigating allegations of sexual harassment. Wills also
met personally with the Provost. Thus, Wills informed an official
at Brown, with the authority to address the alleged discrimination
and to institute corrective measures, of the assault by Adesogan. 
See Gebser, 118 S. Ct. at 1999. The record also contains
correspondence between Wills and the Dean of the College, which
indicates that the school would accommodate Wills's desire to take
an incomplete in organic chemistry. This correspondence suggests
that Wills gave notice to the University officials in 1992 that she
was unable to continue with her organic chemistry studies because
of her experiences with Adesogan. Further, in Wills's "Motion to
Determine in Advance of Trial the Admissibility of Defendant's
Subsequent Acts," she claimed that Brown "was aware that she was
continuing to experience emotional and academic difficulties as a
result of Adesogan's assault upon her in 1992." Moreover, in a
pre-trial conference, Wills's counsel claimed that Wills's name
appeared in more than fifteen documents relating to the '93/'94
time frame which indicated that Brown was aware that Wills was
continuing to experience significant difficulties at school. At
trial, the Dean of the College testified that in the spring of 1994
Wills came to her because of difficulty with the second half of
organic chemistry.
In Gebser, the school district had received complaints
from parents that the teacher involved in a sexual relationship
with the student was using inappropriate and sexually explicit
language in his class. The Supreme Court rejected the argument
that such complaints met the notice requirement of Title IX. "That
[notice] . . . consisted of a complaint from parents of other
students charging only that [the teacher] had made inappropriate
comments during class, which was plainly insufficient to alert the
principal to the possibility that [the teacher] was involved in a
sexual relationship with a student." Gebser, 118 S. Ct. at 2000. 
Contrary to the Gebser scenario, Wills's report to Brown of the
sexual assault by Adesogan, of her inability to continue with the
study of organic chemistry in the fall of 1992, and of subsequent 
emotional and academic difficulties she was having because of the
assault by Adesogan, was not "plainly insufficient" to alert Brown
to the existence for Wills of a hostile educational environment
that altered educational conditions for her at Brown. See id. at
1999 (the institution must have "actual knowledge of discrimination
in the recipient's programs"). Moreover, there is evidence that
Brown knew of Adesogan's assaults on other women students at Brown
before Wills attempted to take the second half of organic chemistry
in the spring of 1994. Accordingly, the next issue is whether
Wills can demonstrate that Brown was deliberately indifferent to
discrimination.
3. Deliberate Indifference
Once the institution is placed on actual notice of sex
discrimination, the institution is given an "opportunity to rectify
any violation." Gebser, 118 S. Ct. at 1999. If the response is
adequate, the institution satisfies its obligations under Title IX.
See id. Only where the institution's response amounts to
"deliberate indifference to discrimination," id., or "is clearly
unreasonable in light of the known circumstances," Davis, 119 S.
Ct. 1674, will liability attach. This requirement comports with
the administrative enforcement scheme for Title IX which
contemplates action only when the "official who is advised of a
Title IX violation refuses to take action to bring the recipient
into compliance. The premise, in other words, is an official
decision by the recipient not to remedy the violation." Gebser, 118
S. Ct. at 1999. By requiring the plaintiff to prove that the
institution's response was deliberately indifferent, there is no
"risk that the recipient [of federal funds] would be liable in
damages not for its own official decision but instead for its
employees' independent actions." Id. 
Only "known circumstances" inform what can be considered
a "clearly unreasonable" response. Davis, 119 S. Ct. at 1674. 
Thus, the adequacy of a school's response may change with an
increase in the school's knowledge of the circumstances of
discrimination. In a case such as this, Brown might not be liable
for Adesogan's individual act of sex discrimination (the sexual
assault on Wills) because of a lack of notice of any prior
misconduct by Adesogan. Moreover, its initial response to a first
complaint of misconduct from Wills might be adequate for the
purpose of the Gebser and Davis analysis. However, what was an
adequate response to a single complaint of sex harassment may
become "clearly unreasonable" when the school is placed on notice
by additional complaints or other pertinent information. See,
e.g., Davis, 119 S. Ct. at 1674 (noting that the petitioner might
be able to show that the school subjected her to discrimination by
failing to respond to complaints of misconduct by both the
petitioner as well as other female students). Accordingly, in the
context of the hostile environment claim in this case, Wills must
demonstrate that Brown's response was deliberately indifferent to
the hostile educational environment created for her by Adesogan's
assault and continuing presence in the classroom in light of the
notice the school received of Wills's ongoing problems with
Adesogan's presence and reports from other students of Adesogan's
misconduct. 
In response to Wills's complaint, the Provost and the
Dean of Faculty met with Adesogan who admitted that he had pulled
Wills onto his lap, hugged her, and perhaps touched her breast
accidentally. The Provost sent Adesogan a letter of reprimand,
condemning his behavior and placing him on probation. The Provost
warned that "a second incident of unacceptable behavior will
constitute grounds for immediate dismissal." However, in the 
Provost's deposition, he acknowledged a memorandum from the Dean of
the Faculty to all Department Chairs and Directors of Programs,
issued in September of 1992, summarizing the University's policy
prohibiting members of the faculty from engaging in acts of sex
discrimination against students. According to the memorandum, "a
faculty member or teaching assistant violating the policy will be
subject to immediate suspension and/or dismissal." Approximately
two months after Wills's complaint about the sexual assault,
members of the chemistry department recommended that Adesogan be
retained for the next academic year, notwithstanding his
"mistakes," and that he be given a raise. Provost Rothman accepted
the recommendations and reappointed Adesogan, awarding him a raise. 
Thereafter, more women came forward to notify Brown of
Adesogan's misconduct. In September 1993, Tilly Gurman filed a
written complaint alleging that Adesogan had sexually harassed her
in the fall of 1992, prior to Adesogan's assault on Wills. The
Assistant Dean of Academic Affairs and the Provost decided to take
no action, concluding that Adesogan had already been reprimanded
and warned of the consequences of his behavior following the event
with Wills. 
In January 1994, Amy Sanford informed the Assistant Dean
that Adesogan had hugged and kissed her on a number of occasions in
the fall of 1993. Although Sanford did not file a formal
complaint, the Assistant Dean did report the allegations to the
Dean of the College. No action was taken and Adesogan remained in
the classroom. In fact, as already noted, he was the only
professor teaching the second half of organic chemistry in the
spring of 1994, a gateway course for medical school which Wills had
to take. Brown took no further action against Adesogan until March
of 1994 when it received complaints from six female students in a
one week period that he had assaulted them. 
On these facts, I cannot say as a matter of law that
Wills could not persuade a reasonable fact-finder that Brown's
decision to keep Adesogan on the faculty and in the classroom until
March 1994 reflected deliberate indifference to a hostile
environment that altered the conditions of Wills's education at
Brown. In reaching this conclusion, I am not suggesting that an
educational institution, after verifying a claim of sexual
harassment by one of its teachers, must terminate that teacher's
employment in order to avoid Title IX liability. Cf. Davis, 119 S.
Ct. at 1673-74. The adequacy of the institution's response,
assessed within the rubric of deliberate indifference, will depend
on a myriad of factors relating to the nature of the harassment,
its duration, the roles of the harasser and the victim before and
after the harassment, the nature of their continuing contact, other
acts of misconduct by the harasser known to the institution, and
the conditions altered by the continuing presence of the harasser.
In this case, a jury never considered this myriad of
factors because the district court took an unduly restrictive view
of hostile environment discrimination, believing that only a second
assault by Adesogan on Wills or some other form of direct
harassment would constitute such an environment. The court was
unwilling to consider that a hostile environment could exist on the
basis of other factors in this case, the response of Wills to the
sexual assault and the continued presence of the harasser in the
classroom who, because of his presence, denied Wills a benefit of
her education at Brown because of her sex. Title IX protects
individuals from such discriminatory practices carried out by the
recipient of federal funds. See Gebser, 118 S. Ct. at 1997. Wills
contends that Brown, through its deliberate indifference, was
responsible for that denial of an educational benefit because of
her sex. The district court wrongly precluded her from presenting
this claim to a jury. We should correct that error.